Now we come to Marceau v. Blackfeet Housing Authority and others. All right. Hear from the appellants. Who's going to argue?  The appellants, okay. If you want to make an open statement, then they turn it over to you. Sure, sure. Honored members of the court, my name is Jeff Sienkiewicz. I'm a lawyer from Billings, Montana. I have a master's degree in public health. Five years ago, I had a secretary who came from the Blackfeet reservation and told me about sickness in every house and asked me to come up there. And I did. And we filed this lawsuit, the appeal of which, for being tossed out of district court, is here today. And I'm here to tell you why the district court had erred. Why the district court had made a mistake. The district court made a mistake when it failed to allow claims against HUD and the government for breach of the Indian trust responsibilities. They had a precatory duty. It was not optional to provide sanitary, safe, and decent housing. They did not. When my clients, who are a subclass of the Blackfeet tribe, living in 153 houses built under a HUD program, they were told, you will have wood foundations or you will have nothing. Take it or leave it. The government made it that way, and it's my position. Who told them that? They were told. HUD was told, Your Honor. HUD told the Blackfeet people, when they were getting these houses back in the 70s, you will have this design or you will not have these houses for your people. This design of it. Okay. I missed a word. It said, you have this design or you will not have a house. Is that right? Yes, Your Honor. It's a wood foundation design made of pressure treated wood with arsenic, chromium, and other chemicals. Arsenic is a very big pathogen, toxin. It is very toxic. If you burn just a half an ounce of the wood, it would be enough to poison a family. It emits gases and the design of the house, poorly controlled moisture in that area, the moisture caused mold. There are many types of mold, but there are dangerous molds that are toxic that exist in these houses that weaken the immune systems, cause asthma, hoarseness, pneumonia, possibly cancer, possibly other medical conditions that are very serious. And so when I went up there five years ago, I was told there was sickness in every house. And we filed this action. And the court erred, as I said earlier, in denying our client's claims to a breach of immune trust responsibility. And then when they wished to make something of it, to sue the government, to sue HUD, to sue their own housing authority, a stat trap of the government, they were unable to do so because the district court erred in failing to apply the Administrative Procedures Act. And the district court erred in failing to recognize a waiver of sovereignty that the housing authority had in the way it was doing business. And the district court also was mistaken, I respectfully suggest, your honors, in that they said that our client's only claim was in the court of claims. In the court of claims, all right. When what we are simply asking is for judicial and injunctive relief. I thank you for allowing me to... You're not asking for money to rebuild the houses or remedy the problem? Well, I will tell you what we want. We do want the houses to be remedied, your honor. Either that we get money to fix them or to replace them as needed. We are asking that the court issue an order because the government does not have the money, nor does it have the will or the vision to find it, to help these people who have been trapped in unsafe, unsanitary houses for over 25 years. In fact, these people cannot even buy the houses they've been leasing and renting for 25 years because there's no clear title to give to them. But the main thing we're seeking... Who owns the house? Who owns the houses? The tribe owns the houses. I mean, some tribes, you know, land is owned communally. Your honors... Navajos. It's my understanding that the tribe in effect owns the houses, but there's a separate mortgage on the land as well. And so even though people have lived there for 25 years, what they're buying, if they wish to buy it... Who holds the mortgage on the land? I do not know, your honor. But I know that the land has been mortgaged by the tribe. So the tribe has a loan on the land or something, and they give the land as security? Yes, your honor. Are the individual families who live in the homes considered homebuyers within the meaning of the regulations that were in effect at the time the homes were built? Your honor, it's my understanding that if you reside in a home and pay for it for 25 years, you're entitled to get a deed for it at the end of that time. I guess the one question I would have for you that concerns me is that in the regulations that governed Indian housing at the time, there is a provision for warranties for the property. And there's a further provision that at the end of the warranty period, all responsibility for repair from whatever cause flows to the homebuyer and no longer to the government. What do we do with those regulations? What effect do they have? Well, if you'd allow me to try to answer this, I can in a bare way, and I know that Ms. Sutton can do a little better. But if you'll allow me, I'll try to answer this. The government, we believe, abandoned their responsibilities by being the sole source of funds to the Tribal Housing Authority, telling the Housing Authority how they can spend the money and how they can do it, and to repair these defective houses that cannot be repaired. The government had to, it was not precatory, provide safe, decent, and sanitary housing. They thought at the time that they built it that the wood foundations were that. They were inexpensive. But they knew or should have known, we also contend, that the conditions and the environment are not suitable on the Blackfeet Reservation because of the water levels and the moisture there for wood foundation housing. And we also know, although we couldn't prove it because we couldn't do discovery, but we know from anecdotal tales from our clients that this design of the housing was vehemently opposed in the mid-'70s, and they were forced to have it. Then, opposed by whom? Forced by HUD to take this money or get no money, is my understanding, Your Honor. Take it or leave it. Lift that microphone up a little bit. We're just recording you. You're going to be on disk in perpetuity. I think you said the word opposed, and then I thought you said forced after that. I guess I got lost in exactly what you were saying. Thank you for allowing me to clarify this, Your Honor. We don't want these houses. They're not suitable for us. If you don't get these houses, you don't get any houses. Okay, we'll take these houses and try to make the best of it. The houses were not properly constructed. They became moldy. They got contaminated from sewage, from septic systems, and from rain. The CCA-treated wood got people sick. That wood is banned by the EPA as of 2002 for use in playgrounds and schools. That's been getting people sick. It's got arsenic, chromium, and other stuff. Take this or leave it is what they were told, and they took it. And then the government, to kind of segue back to your question, Your Honor, abandoned its responsibility, which we say they cannot do, by saying it's the housing authority's job to take care of it. What was the period of the warranties under the regulations? That is a very great area. It's my understanding that the builders of the homes soon thereafter went bankrupt. Let me ask you. That doesn't actually answer my question about the length of time the obligation existed under the warranties. Well, Judge, I don't think I can specifically answer that question. I would go back to my point that the people of the reservation, Indian people, people in the United States on government housing, but particularly those that have a trust relationship with the government, where the government has a fiduciary relationship to them, it's not purgatory. It's no choice. They must have adequate, safe, decent, and sanitary housing. I believe that warranty runs in perpetuity, and that if the housing that has been provided without option is unsafe, unsanitary, that the government cannot abandon its responsibility to remediate it. Well, you're saying that you have this trust relationship that exists between the government and the tribes, and that that trust relationship has been violated. And that's over and above statutes. Well, I think there are statutes. Beyond statutes. There's this basic trust relationship. Yes, I am, Your Honor. But I believe that there are statutes that back it up as well. Okay, should we hear it from your partner? Yes. Thank you very much for the honor of speaking to you. Good morning, Your Honor. Does this seem to be appropriate level? Yes, sir, I am. Good. I like Missouri. I know that, sir. I was Judge Bart Erickson's career law clerk. What did you say? I said I was Judge Bart Erickson's career law clerk in the District of Montana. Oh, is that right? It's my honor to appear in front of you today. How's he doing? He's doing well. Good. He's a grandfather now. True name was Leif Erickson. Leif. Leif. Leif. I'm sorry to correct his honor, but I'm very particular about that. I learn every day. Pardon me, I'm hard of hearing. I said I learn every day. Thank you. We all do. I think the judges have honed in on perhaps what is the weakest and perhaps at this point of this case and in the litigation, the least relevant points regarding obviously fraught with difficulties, questions of discovery, of statute of limitations, of what type of warranties and how long that they would have run under Indian housing programs that were in existence at the time this was filed. I believe the court should not be distracted by those questions which are more properly directed to the district court upon a remand. The most important point that plaintiffs stand before you today is to say that, yes, in the past and has been acknowledged, there were causes of action and waivers of sovereignty, waivers of sovereign immunity under the Indian Housing Act of 1937, under the Mutual Health and Home Ownership Act, under which these plaintiffs obtained their homes. Under the Indian Housing Act of 1986, I believe, and I may misspeak on that date, it's acknowledged that causes of action exist there, that there were waivers of sovereign immunity under those acts that would allow plaintiffs to come forward on a federal question jurisdictional basis. The most important point is that plaintiffs have shown that there are current duties today under the current regulations of Indian housing, which we refer to as NAVDA, Native American Housing and Self-Determination Act. The questions of whether causes of action that arose in the past, whether these are continuing torts, whether there can be recovery under these essentially state law theories that have been incorporated into federal law, are additional issues that are presented here. But it is appellant's position that we have shown a basis for the waiver of sovereign immunity through NAVDA itself, as well as showing under a Mitchell II type analysis of the Indian trust relationship, that the expansiveness of the agency's administrative regulations concerning Indian housing in the past and still today provide a current remedy for the situation of the plaintiffs. Yes, plaintiffs are seeking monetary relief in the alternative in the sense that, yes, as a federal question, we have a waiver of sovereign immunity of the United States government. It was clear and recognized by the district court and is well established that there were private causes of action and a waiver of sovereign immunity under the Indian Housing Act of 1937 that carried, I'm sorry, I misspoke, under the U.S. Housing Act of 37, the Indian Housing Act of the 1980s. There was no explicit waiver of sovereign immunity. Let me back up. Indian housing has been addressed by HUD since the earliest days of the Reorganization Act back during the Depression years when these agencies were created. There was a question of whether the national housing policies even applied to Indian people. That was clarified. Did HUD exist in the 30s? Pardon me, sir? Did HUD exist in the 30s? It was the United States Housing Act. But, I mean, HUD is a... It would have been its predecessors in interest, and honestly, I don't know the question to answer that, sir, whether it was referred to HUD in that era or later. Housing and urban development, it seems to me it would be more of a 60s evolution. 60s or 70s, yeah. My point being, as we have gone from the general national housing programs, we have become specifically more tuned to Indian housing. In the 1980s, the Indian Housing Act itself, specifically addressed to Indian housing, was enacted. There was no specific waiver of sovereignty for suits under the Indian Housing Act. However, the law is well established in the 30s. Who was the secretary of HUD when these houses were built? I'm not sure, sir. May I go on? The government will tell us. Maybe they'll know. Okay. As national legislation regarding Indian housing has become more specific, they have now enacted special laws directed only at Indian housing. The most recent evolution of that was in 1996, the Native American Housing and Self-Determination Act. That act, like the Indian Housing Act, does not contain a specific waiver of sovereign immunity. However, it contains a savings clause. Found that in our briefs, 25 U.S.C. section 1483, therein saying that any rights or causes of action, obligations or duties by any of the parties involved is not abrogated by the enactment of NASA, which repealed the Indian Housing Act. The district court erred in not carrying forward the waiver of sovereign immunity from the Indian Housing Act into the NASA act. The only way to find- Does the savings clause require that there have been a, some sort of timely claim before the passage of NASA itself? I would say yes, and that there are continuing, repeated, each instance creating a separate court, and that there were causes of action that were right. Under the Indian Housing Act in the 80s, these houses were built in the late 70s. And at that time, yes, causes of action would have arisen. And if NASA is to be interpreted to not have a waiver of sovereign immunity that carried through, then it is prohibited retroactive legislation, which has taken away the causes of action that previously existed. Your position is the saving clause would mean that if there was a claim before it was enacted, subject to a waiver of sovereign immunity, that wouldn't be canceled out. That's right. And the district court recognized this. Judge Patton was uncomfortable with the concept that he had acknowledged a waiver of sovereign immunity in the existence of causes of action. But yet suddenly in 96, when NASA is enacted, those rights are abrogated. And in a footnote of the judge's comments or argument, he signaled his discomfort with that. I think the only logical interpretation is that the waiver of sovereign immunity pursuits against the government that existed under the U.S. Housing Act and the Indian Housing Act have carried through to NASA. If there are no more questions, I would move on to Plaintiff's second point, which I believe is our strongest, that the district court erred in not granting Plaintiff's request for administrative review of the Administrative Procedures Act for judicial review of the administrative agency. Yes, there are elements of Plaintiff's claim for the breach of trust responsibility which would involve recovery of monetary damages. However, in addition and in the alternative, the appellants have asked for declaratory and injunctive relief under the Administrative Procedures Act. Our plaintiffs stand, yes, as Blackfeet tribal members, but additionally as citizens of the United States who are entitled to invoke the waiver of sovereign immunity in the Administrative Procedures Act. What could just an injunction or a declaration do without money attached? In other words, if there's a declaration that the housing is unsafe and that's the end of it, no money, what could this do to your clients? It does quite a lot of good, Your Honor. When the judicial branch makes a declaration in judicial review that the executive agency is violating its duties currently or in the past, it's not the role of the judiciary to tell them how to fix it. On judicial review of agency action, the court says, you're doing it wrong, go fix it. It's then up to the agency to determine what steps to take next and then to approach the third branch, to approach Congress with the force of a court's order behind it, saying we have to do something different and we need money to do it. The fact that money would be expended in complying with a mandatory injunction or an affirmative or prospective injunction from this court does not make it a claim for money damages. This is Bowen v. Massachusetts. It's very clear, even though money may follow and it may cause expenditure of public funds, it is still just a declaratory injunctive relief request. On the third point, which is a very weighty issue, on the question of the waiver of sovereign immunity for the Tribal Housing Authority, the presence of Tribal members here today can demonstrate to the court what an important issue this is. And this could be the most important legal issue in this case, although factually in the interest of my clients, it's one of those that perhaps there's more interest to us than to the clients themselves. For many, many years, there has been a misinterpretation of how tribes were incorporated under the Indian Reorganization Acts back in the 30s. When tribes were allowed then to come forward from the termination period, from the extermination period, were then allowed to reorganize under the Indian Reorganization Act, 25 U.S.C. Sections 476 and 477. The distinction between those sections is very important. Indians were allowed to reorganize themselves and create constitutions and exercise powers of self-government. Additionally, under the next section of the Indian Reorganization Act, those governments which had organized themselves were able to take the next step and to incorporate themselves into business agencies such as tribal housing authorities in order to engage in commerce. The powers of self-governing and the sovereignty inherent in Indian self-government rests under what is known as Section 16 of the Indian Reorganization Act. There has been a very broad brush painted for decades in this country that says because the tribal government is a Section 16 entity under the Indian Reorganization Act, anything they do then is imbued with the sovereign immunity. There are recent commentators, particularly in the landscape after the Mitchell II cases of the fiduciary-like duties towards the Indian nations, that have commented that there's a very simple distinction that has been missed. That when those tribal governments created under the Section 16 of the Indian Reorganization Act then went further and incorporated business agencies, that was done under Section 17 of the Indian Reorganization Act as a corporate entity. In the 1940s, the Department of Interior, the Secretary of the Department of Interior was presented with the question of whether Indian nations who were organized or not under the Indian Reorganization Act would be worthy, able, capable, or intended to be recipients of federal funds of housing money. The answer from the Secretary of the Department of Interior was a resounding yes. It will apply to Indian peoples. And it applies because under the Indian Reorganization Act, they not only exercised their powers of self-government, they went further and incorporated with public corporate structures able to engage in business and commerce. And it was because they were willing to step into the world of commerce and that they had enacted provisions that allowed them to sue and be sued as anyone in a commercial setting needs to be. Coincidentally or serendipitously, it was the Blackfeet tribe that is the subject of this 1940 Department of Interior opinion. The Blackfeet people have always been very strong, very assertive in their race. They were the first nation to receive this kind of funding. And it's made clear in the Secretary's opinion that the reason Indian tribes like the Blackfeet will be capable of administering low-income and slum housing programs is because they are incorporated and, quote, particularly the ability to sue and be sued. In the District of Montana, there are three authorities standing. The Hageen case, H-E-D-E-N, the R.J. Reynolds, and the Fort Belknap cases, two of which came before this Court and were affirmed. In those cases, the Montana District has consistently taken the approach that tribal sovereignty, that of the tribe and the powers of self-government, is inviolate. That's not what plaintiffs are here requesting. What the Montana District Courts and a few others have recognized is that when the Indian nations step into the world of commerce, they are liable to be sued. They may sue themselves. There is no credibility to an organization that engages in commerce and yet is able to absolve itself of all liability. Now, but the Texas Circuit has taken the position that a waiver of this sort waives immunity with respect to suits in the tribal court, but not necessarily suits in the federal court unless it says that specifically. What is your response to that line of thinking? My response is that it's a separate situation, Your Honor. It's not apples and oranges because the breadth of tribal sovereignty cannot be curtailed in that sense. We are not looking at a situation of individual tribal members attempting to get relief through the tribal court. Our clients have tried for decades to get relief through the tribal house. I understand that. I'm talking just strictly about the waiver of sovereign immunity that doesn't specify where the entity can sue and be sued. Is that waiver limited to the tribal courts? In other words, sue and be sued there? Or is it broader than that? I believe it's broader than that, and without reading the sue and be sued clause that is at issue here from the Second Circuit case, I'm going to assume that they're all the same because every Indian nation was asked to enter into these Section 17 sue and be sued clauses. I would say that our position on that is broader in that this would not involve just suits only brought into tribal court where the tribe or the housing agency or other tribal authority has waived its right to sue or be sued. I say that it is broader than that. Why don't you just sort of sum up for us and we'll hear from the other side and we'll give this time to the public. To sum up briefly, it's the appellant's position that reversible legal errors were committed by the lower court, first in failing to find a waiver of sovereign immunity within the Native American Housing and Self-Determination Act, which carried over from the Indian Housing Act and the U.S. Housing Act. That waiver of sovereign immunity, coupled with the trust responsibilities arising out of NAHASDA in the earlier acts, show going beyond the general trust responsibility to a specific trust responsibility that is on the level of the White Mountain Apache case. Secondly, it was error for the district court to reject plaintiff's request for administrative procedure application for judicial review of the agency. There's a clear waiver of sovereignty under the APA and these claimants stand no different than any other United States citizen who seeks judicial review of the executive agency. Thirdly, it was error for the court to not recognize a waiver of sovereignty on behalf of the housing authority. We believe the language of the sue and be sued clause stands for itself. There is authority from this court affirming the line of cases from the District of Montana, which affirms the distinction between the organization of tribal governments under Section 16 of the Indian Reorganization Act and Section 17 through which they engage in corporate powers. The opinion of the Secretary of the Department of Interior at the contemporaneous time that these acts were undertaken shows the congressional intent that Indians be amenable to suit, be able to sue and be sued in order to obtain the housing funds. The court should give deference to the agency's interpretation of its own regulations and that it does apply to Indians and that it's required that they be incorporated before they are allowed to administer these funds. Finally, our last point is it was error for the court to find that the only remedy for these plaintiffs was under the Indian Tucker Act before the Federal Court of Claims. We are different and not constrained by the other cases. For example, the DeWa Kupu case, which came out of Arizona on similar factual issues. We are not constrained to falling under the Tucker Act and the claims to court because we have independent waivers for sovereign immunity and independent causes of action under NASDA as well as the Administrative Procedures Act. Particularly when claimants are seeking injunctive and equitable relief, their claims will not be constrained to the court of claims. Thank you, Your Honor. Thank you. May it please the court, I'm Tim Calvin. I'm an Assistant U.S. Attorney from Billings, Montana, and I'm appearing on behalf of the United States Department of Housing and Urban Development. Subject to the court's questions, we'd like to reserve at least six minutes for Blackview Housing. Your Honor, the single fatal flaw which runs through all of the claims in this case, all of the plaintiff's claims in this case, can be summed up under one simple principle, and that is lack of duty. Lack of what? Lack of duty, Your Honor. There is simply no basis in the law to support the expansive duties that the plaintiffs seek to impose upon the government in this case. The regulations that were in existence at the time of this project required development and compliance with minimum property standards. Do you understand the allegations to cover an assertion that the minimum property standards that were in effect were not complied with? And if that's included, why wouldn't that be a duty? Well, I think that the construction, the responsibility for construction of the homes, was the duty of the housing authority. The housing authority had the duty to comply with the minimum property standards. HUD's obligation under the regulations was oversight to review the plans and to ensure that they were in compliance with the minimum property standards. Does HUD come out on the job site and check the work? Your Honor, that I don't know. I think that what the regulations provide for is that the supervision of the project is the responsibility of the housing authority. HUD doesn't really come out. They just give them the money and they get some plans and they look at them. In practice, Your Honor, I don't know how it operates. Under the regulations, HUD provides the money. HUD approves the plans. HUD approves the construction as it is in progress. HUD approves the final project and releases the funds. HUD does not build the projects. HUD does not supervise the building of the projects. And Judge Graber, I'm not sure if I completely answered your question with respect to the minimum property standards. I don't know whether their claim is that these homes did not comply with the minimum property standards. I believe in our brief we showed that at the time, what treated foundations were within compliance with the minimum property standards of HUD. I understand your position that HUD itself owes no duty for a variety of reasons. In the government's view, is there any recourse available to these plaintiffs to solve their problem? Well, Your Honor, I'm not certain of that. I am certain that there is no recourse against the United States government. Whether there's a recourse against the housing authority, which had a contractual relationship with these home buyers who constructed the homes, I don't know. Whether or not they had a recourse against the manufacturers of this wood-treated foundation for some type of a products-based claim and a cause-effects against the manufacturer, the commercial retailers, the distributors of that, I don't know. There were warranty claims, and they provided that there were warranties that attached to these homes that had to be pursued through the housing authority because the housing authority had the contractual relationships with the developers of the projects and the sellers of the products. So they quite possibly could have had, and they have, traditional products-based actions against them. I have a question for you, sir. When you raise the issue of whether there's a duty as sort of a fundamental issue here, is that an issue as to the United States that we reach in relation to or integrated with a sovereign immunity analysis, or is that an issue that we would get to only if we first concluded that there was a waiver of sovereign immunity? Absolutely, Your Honor. The issue of sovereign immunity has to be resolved first with respect to each and every one of the Mercellus claims. It's only after you get by that point you determine whether or not the plaintiffs have a viable cause of action, whether or not the government has any duty that they seek to impose. But I understand that the district court here, stating this in a simplistic way, found sovereign immunity of both the defendants, and the plaintiffs don't get out of the starting blocks, essentially, and there's really not an examination of this duty issue. Well, I think under some claims the district court did recognize there's a waiver of sovereign immunity. There is, for example, a waiver of sovereign immunity under the United States Housing Act with respect to HUD's functions under that act. What the court did was then look at whether or not, because there was a waiver of sovereign immunity, whether or not there was an implied right of action under that act or whether or not they could assert a breach of trust responsibility under that act. The court found that the claims in this suit, there was a waiver of sovereign immunity under that act, but the claims in this suit couldn't be covered by that act. Right, that there was no viable cause of action under that act. No cause of action under that act. Right. Well, what were the claims covered by that act? What claims would be covered by the act? Yes. Well, there's a waiver of sovereign immunity with respect to HUD's functions under the United States Housing Act. Tell me what claims would be covered. Well, for example, if HUD had failed to pay a tribal housing authority or another housing authority its annual contribution that is required under the act to the housing authority, the housing authority would have the power to enforce that under the act. Essentially if HUD had failed to take any action that it was required to take under that act or if HUD had withheld any action it was required to take or did something contrary to that act. So to the extent that there was a duty of oversight, if HUD failed to perform its duty of oversight, presumably that would be covered as well. Well, it depends on what we're talking about. It depends on what oversight duty that they claim is breached. Well, you're the one who said earlier that HUD had oversight duties. Whatever those are in your list, items 1 through 22, whatever they are, if they are breached, then in your own construct it would seem that that would be a permissible subject of suit. Well, no it wouldn't, Your Honor, because under the suit, in order to bring a suit against the United States under the United States Housing Act, there would have to be some implied right of action against HUD for that. And the cases have consistently held that there is no implied right of action against the government for breach of the broad principles that are stated in the United States Housing Act. If I imagine if their claim, and I don't understand this to be their claim, but if it was their claim that HUD was responsible under regulations to approve something and they did not approve something, that may be a viable claim, I don't know. But I don't understand that to be their claim. Well, when it comes to Indian housing, are HUD's obligations greater than they would be if we weren't dealing with Indian housing? HUD makes a lot of loans all over the place. And is there, because of the relationship between the federal government and the tribes, there's a trust relationship. That's right, no? Correct. Is there a heightened requirement, heightened sense of duty or whatever you want to call it? Well, Your Honor, I think... They have to give the money up to save sanitary and decent housing, right? That's correct. All right. And let's say that that isn't complied with. Housing is not safe, it's not sanitary, it's not decent. Well, Your Honor, I think that there's two things there. HUD is not required under any statute. Let's say that HUD gives money to save sanitary and decent housing. And the housing is not safe, sanitary, and decent. What's HUD's obligation? Well, none, Your Honor. The obligation to construct decent, safe, and sanitary housing is the obligation of the housing authority. HUD provides the funds to the housing authority for the construction of the project. But nowhere in any of the statutes is HUD imposed with the duty to build safe and sanitary housing or to repair or to remediate housing so it is safe, decent, and sanitary. So, no, HUD does not have that duty under any of the statutes. With respect to Indian housing, Your Honor, you're correct that there is a general trust relationship between the United States and the Indian people. And that can impact in the way the court interprets a statute. Statutes passed for the benefit of Native American people should be interpreted as such. It also dictates in general how the government should deal with Native Americans. But it really has no impact at all in the analysis of whether or not they have a cause of action for violation, for example, of a breach of a fiduciary trust relationship. And so I think that there's separate principles that can't be confused. You're saying if the government has a trust relationship with the tribes, with the Indian people, that they don't have a remedy against the government if that obligation's been breached? No, Your Honor. There are two separate concepts, and the Supreme Court has made this clear in their decisions. The general trust relationship that undeniably exists between the government and the Indian people is there. But that's not sufficient to create a cause of action for a violation of that relationship. If that were the case, Your Honor, any time the government took any action that impacted the Indian people or an Indian person that the Indian person thought was not in their best interest, they would have a cause of action against the government. A cause of action for violation of the breach of a fiduciary relationship requires much more than that. And the Supreme Court has made that very clear. It requires, again, the waiver of sovereign immunity and a claim falling within the terms of that waiver. It requires a source of substantive law that establishes specific fiduciary duties the government is required to perform on behalf of the Native American people. You know, one time, I'm trying to recall this, we had a case where the Bureau of Indian Affairs, the tribe that's been a long, long time, had this money that belonged to children or people involved in the tribe. And they put it in a bank in Arizona and a non-interest-bearing account. And this went on for years. And the court held that they had a fiduciary duty in the way they handled that money and it had to come up in the interest. I don't remember what the sovereign immunity issue was. That fits squarely within what the Supreme Court has established for the cause of action for breach of fiduciary trust relationship. When the government goes out and assumes control over tribal property and resources for the benefit of Indian people and exerts extensive, pervasive control over those resources, as it did in that case, then a judicially enforceable trust relationship can be found. But if HUD gives money and they set up these requirements and they want to look at plans and they want to check this and they want to check that, they want to make sure it's decent, safe, and sanitary, what's the difference between the two? The difference is, Your Honor, in the first example, HUD is exerting or the government is exerting control over tribal property and resources. In this situation, the government is not exerting control over tribal property and resources. It is extending supervision over federal property and resources that it provides to the tribe. And it is overseeing, generally, how those funds are spent and how those funds are used. Those are federal resources. It's on tribal land. Excuse me? It's on tribal land. Well, I'm asking the houses where it's being constructed. And the government knows, or should know, I would think, that maybe those folks need a little extra help, a little extra supervision. You know what I'm saying? Maybe you don't. Well, Your Honor, the government in HUD... HUD hasn't been so great in supervising projects all over this country. We know that. I personally don't, Your Honor. I do because I handle some big settlements and all that kind of stuff. In answer to your question, though... I asked them for a list of all projects to which they gave money. And they had such a list. And when they finally sent me a list, I had it audited by Price Waterhouse. And I'd say about 20% of the properties on that list were non-existent. But, Your Honor, to answer your first question, is the government... The houses happened in the 70s. That's correct, Your Honor. The houses were constructed in the 70s. Who was the secretary of HUD at that time? My able counsel from HUD wrote a note that it was Patricia Harris, I believe, in the Carter administration. But here the HUD was not, as I understand it, administering tribal or Indian property. HUD was loaning money to the Indian agency to facilitate the development of housing, I guess. Their housing. Their housing, which they had the title to. So I understand that distinction. So I'm not quite sure how it all plays out. But if there was a waiver of sovereign immunity in the first Housing Act, the general one... The United States Housing Act? The United States Housing Act. And then if you have some claim arises, and then there's a later Housing Act focused on Native Americans that does not include a waiver of sovereign immunity, but got a savings clause, would the government agree that an existing claim would continue as opposed to being abrogated? Yes, Your Honor. Your Honor, I think if there is an existing claim under the U.S. Housing Act, that would not be abrogated by passage of the HOSDA. But that waiver of sovereign immunity doesn't carry over into the HOSDA and all of a sudden make that. That waiver of sovereign immunity does not apply to the new duties and responsibilities under the HOSDA. It would apply to... Old duties. It would still apply to a breach of an old duty. That's correct. Were there waivers of sovereign immunity? I know there was in the U.S. Housing Act, and then there wasn't in the HOSDA or the last one. But what about the ones in between? The Indian Housing Act and the National Housing Act, Your Honor. The Indian Housing Act was passed in 88 and was made, as I understand it, a Title II of the United States Housing Act. And, for example, the Diwakuku Circuit case found that that waiver of sovereign immunity in the United States Housing Act applied to the Indian Housing Act when it was in existence. But it was only in existence from 1988 to 1996, and so therefore it wasn't in effect when these homes were constructed and doesn't have any application present-day either, so it's largely irrelevant in this case. Okay, thanks. And I see that I've gone past my time, so thank you very much. What was the reason that made that sovereign immunity waiver applicable during that period? During the 1988 to 1996? Yeah. Again, the Indian Housing Act was passed and made a part of the United States Housing Act. So it was determined that the sue and de-sue clause in the United States Housing Act applied to Title II, which was the Indian Housing Act. Even though it wasn't printed in there? It was made a part of the U.S. Housing Act. By the courts? No, by Congress. By Congress. Congress passed the Indian Housing Act. It was made a part of the United States Housing Act. So it was sort of like an amendment of the U.S. Housing Act? In addition to... So that the waiver of sovereign immunity provision would still apply? It did to the Indian Housing Act, yes. Thank you. And we better mention the other sovereign, too. May it please the Court, my name is Steve Doherty from Great Falls, Montana. I represent Blackfeet Housing Authority and the individually sued board members, Sandra Kapp-Fosfritz, Neva Runningwolf, Kelly Edwards, Ursula Spotted Bear. With me in the courtroom today are Tom McKay and a board member, Robert Tailfenders, from Blackfeet Housing. To just visit with you briefly about the waiver of sovereign immunity or whether the sovereign immunity of Blackfeet Housing has been waived. Has been what? Whether it's been waived. Waived. And it's clear that Congress can waive the immunity, but it's also clear that the tribes can waive the immunity. But words like unequivocal and clear are used throughout the waiver jurisprudence. Counsel mentioned or got into the argument about Section 16 and Section 17 differences in the Indian Reorganization Act. I'd point out that that was first raised in the reply brief. It was not considered at the district court level. It's a legal issue, so it probably could be considered. Okay. I'm just speaking for myself. Sure. It's pure law, and I don't see why we wouldn't consider the argument. Okay. Well, we haven't had a chance to brief it. Well, if you want to brief it, we'll give you that. Okay. Thank you. But she makes the point that Indian entities, public agencies such as Blackfeet Housing, when they step into the world of commerce, ought to go along with the notion that they can sue and be sued. But what the real point is, is that when they step into the world of commerce, they step in on their own terms. And that's the issue of the jurisprudence that we get with the Eighth Circuit, the Second Circuit, the First Circuit, and the Tenth Circuit, which says the broad cookie-cutter language that HUD made every housing authority adopt authorizes, and we authorize, from the Blackfeet tribe in Ordinance No. 7, that the tribe adopted, which was required to adopt by HUD at that point in the housing world, it authorizes the tribe giving its consent for housing to sue and be sued. But that's insufficient, standing alone, without taking further additional action, by contract, to waive that immunity. It seems troubling to me, the idea that the Tribal Housing Agency could own all these houses, develop them for low-income people to live in, and not be subject at all to suit if they breach the duty. I'm not saying they breach the duty, but the idea that they're totally off the landscape, they're not on the page, it sort of leaves these people without any remedy. Your Honor, I wonder if it makes any sense to interpret the sue-and-be-sued clause that way. If there was no clause, obviously the tribe has sovereign immunity. But it goes forward with a sue-and-be-sued clause in a resolution. So why does it make sense to interpret that to say that the claimants here have zero remedy against the tribe? Well, it makes sense because that's the aspect of being a sovereign. The sovereign can waive that immunity, and it can waive it on its terms. It can waive it in contract. I represent the Housing Authority on a daily basis, and it's subject to negotiation about the immunity, where we can be sued, which courts we can be sued in. You could waive it specifically in a contract. Are there contracts with these home purchasers? Yes, mutual help agreements. And to get back to the question, the houses were built on trust land. You have a mutual help agreement as sweat equity and purchases. Eventually they become homeowners. Sweat equity? Pardon? Sweat equity. Sweat equity. They'll do some things to improve the home. They will do things to improve the home, and the homes can be conveyed to the homeowners when they're paid off. Was there no clause relating to sue and be sued in the agreements under which those individuals took up residency in these homes? The district court found that there was no evidence in the record that indicated that there was an additional action by which the Housing Authority had waived its immunity to sue. Was there a written agreement with these people? Yes. With the Housing Authority? Yes. And it's in the record, I assume. I'm not sure if the mutual help agreement is. We voluntarily produced the ordinance number seven and the various things that you do see in the record with regard to Blackfeet tribal law. So I guess what I want to know, but maybe I don't want to know it if it's not in the record, is whether the agreements that these residents entered had any language about sue and be sued in it. No. Did not. Okay. Well. And I would also point out. Why didn't you put a copy of that sweat agreement or whatever you want to call it into the record so we can look at it? Well, when we had oral argument in front of Judge Haddon, he gave the other side the opportunity to ask for specific things. They never asked for them. Well. So what does that mean? Maybe we don't need something to interpret what the law is. Well, I would submit that you have everything you need to interpret what the law is. I have to trust you, huh? It is a trust responsibility issue. The more you talk, the more I'm wondering what's in those papers. Your Honor, well, it's not in the record. They had an opportunity to ask for it. They never asked for it. They asked us to provide all kinds of information, and we did. We could, I mean, I suppose, and I don't know how the court would feel on it, but if we felt we needed to know what the plaintiffs agreed to with the agency to make a just resolution of the case, we could send it back to the district court and ask for some supplemental proceeding to expand the record. It just might be more complicated than finding another way to get that before the court. But I don't think you have to do anything if we don't order it. And I'm only one judge, so I don't know how the others would feel. I would sure like to know what they agreed to when they, in what terms. It was a standard mutual help occupancy agreement that probably. I don't know what one of those is. Well. Was the standard agreement drafted by the HUD or? It was drafted by HUD. Would that be part of the regulations from 1976? It's referred to in the regulations, but I didn't actually go through that to look and see if. I don't know. It may be part of the regulations that HUD produced because they produced lots of them. So why are you so reluctant to give us a copy? Oh, I'm not reluctant, Your Honor. I'm just pointing out. I never had a lawyer act that way. You know, they said, well, you like it. We'll stipulate. I'll have one in the court by the end of next week. Or tomorrow. I'll find one. All right. I can wait until next week as far as I'm concerned. Okay. How about getting it here for Father's Day? I'm beyond thrilled. I think, Your Honors, the language, the question is. Let me ask you this. Sure. The tribe owns all the houses, right? No. Who owns the houses? The houses, until they are conveyed, it's a nebulous world between the home buyer and Blackfeet Housing. Yeah. So when they're conveyed, the person becomes an actual home owner. And with that goes the lease for the trust land. Blackfeet Housing typically, in the mutual help agreements, gets a lease from tribal trust land from the tribe. It's a 25-year lease. A ground lease. Yeah, a ground lease to cover the trust land. They're paying for the structure. Yeah. They got a ground lease. Excuse me. Pardon? They just get a ground lease. They get a ground lease. And that's because trust land can't be alienated. And the ground is now subject to a mortgage? No. No, absolutely not. Absolutely not.  But the land that these houses hit on is leased to housing, which then enters into a sublease with the individual home buyer. Okay. So the land that the tribe owns is leased to the housing authority of the tribe, which subleases to the homeowners or residents of the houses. Right. And that land is not encumbered by another mortgage right now? Not that I'm aware of. It can't be. And those leases are, what, 25 years? Twenty-five years renewable for another 25. And when housing conveys the property, we also convey whatever interest we have in the lease to the individual. That individual then has a tribal member, deals directly with the tribe on the lease of the land. It's not a big deal. It works. If the housing authority, if it's the owner of the land or the lessee of the land, if it does something that makes the land unsafe for a resident, and let's say it went up and established pools of dangerous chemicals or something on the land, then apart from any, you know, criminal liability, assume that wasn't present, you're saying that because the tribe hasn't waived sovereign immunity, the residents would have no remedy against it? I am saying that, Your Honor. I am saying that as a matter of policy. That's not the concept of sovereign immunity. I'm just trying to figure out how it applies here when we have the sue clause in the resolution of the tribe. If we view what the Blackfeet Housing Authority is doing as a governmental activity, maybe there is no, you know, maybe it's got sovereign immunity. But if we view it as a commercial or quasi-commercial, then I don't know.  Well, I would suggest that the Dylan V. Yankin suitcase coming out of the Eighth Circuit deals directly with whether providing housing services is a governmental or a corporate activity. It's nonprofit. It provides housing to tribal members, tribal members only. It's what governments do. It is not a commercial activity. Blackfeet Housing is not making money off of this. The tribe is not making money off of it. It is simply what governments do. And if you look at Ordinance No. 7, actually, which is in the record, we're talking about a public agency. Private enterprise can't do it. We have to establish this public body. Providing housing is a governmental function of tribal concern. If the tribe doesn't do something, if it doesn't do the right thing with respect to the residents, then I guess your position is there might be a political remedy in how the tribe is governed, but you can't sue the sovereign. You can't sue the sovereign. And different tribes have adopted different limited waivers of immunity. And as I mentioned before, the sovereign can dictate and determine the terms on which it will be sued, which courts it will be sued. The other issue that bothers me a little is whether there are any fact issues in this case on which discovery might make it clearer if there's a waiver of sovereign immunity. This is all dismissed on motion. Right. Well, the judge did look at material outside of the plea, so it's a summary judgment. It's a summary judgment, but apparently that didn't have the form, even didn't have the agreement between the lessees and the sublessees and the lessee, right? Right. I would point out that they have the agreement. Right. So they didn't submit them? No. Okay, thanks. Let me ask you, what are these places worth? I saw an estimate. They vary, $75,000 to $100,000. For each house? For each house. And what do they sell for in this case? Well, they really can't be sold. Once they're conveyed to an individual, but we were looking at an appraisal recently. What do they pay for them originally? Oh, what do they pay for them? Typically the mutual help agreements are the rent or the lease payments are set according to the individual's income. This is all low-income housing, so the maximum I've seen is $400 a month. How many years is that, 25 years? Twenty-five. So when the lease is up, it's a 25-year lease, right? Right. So at the end of that 25 years, they kind of own the structure and they have to, well, there's an option to renew it for another 25 years. There's an option to renew it for another 25 years, but that's, you know, that's the way Indian housing works in Indian country and all across at least the West that I'm aware of. Well, I have a question about the Second Circuit opinion. Is it Garcia? Garcia de Acosta, I think. Okay, let's assume. I'm not saying there is a waiver by the sue-and-be-sued clause, but the Second Circuit, as I understand it, has said if there's a waiver, it's only a waiver that you can be sued in tribal court, not in federal court. Right. Do I have that right? I think that's the whole point, Garcia. So what I'm trying to understand is can that make sense in light of the Supreme Court's Montana jurisdiction? You know, Montana and the cases that follow that, like Strait, that seem to restrict the ability to sue in tribal court, you know, to sue non-Indians in tribal court. So like if tribal members wanted to sue the housing agency of the tribe and a bunch of other parties that weren't tribal members, they couldn't do it in one forum, I suppose, if they could only sue in tribal court. That's a mind-twisting hypothetical, Your Honor. I know, but those things kind of come up. Yeah, but they do. Because I practiced law for a lot of years, and usually when someone came in my office and said, can we sue, they didn't mean can I sue just one party. You know, they wanted to sue anyone who might give a remedy, and sometimes you couldn't tell. Well, I think the jurisdictional issues dealing with whether non-members can be sued in tribal court are extremely complex. I don't mean for you to get into that. Our circuit's got an in-bank case on it now that's complicated, obviously, and people disagree. But as it relates to the Sue and Be Sued Clause, what I was trying to figure out was whether it makes any sense to say, as the Second Circuit says, that there can be a waiver that just lets you sue in tribal court but not in federal court, because I'm worried that that wouldn't make sense because it would leave the claimant with an ability to sue only someone they could sue in tribal court. Some of the dependents. I'm not – Garcia was an employment termination case, as I recall. I don't know if there was a specific contract between Garcia and the housing authority. I would think, you know, from our perspective, that if a housing authority is immune or a tribe is immune from suit, it's immune from suit, period. In both – in the tribal forum? In the tribal forum and in the federal forum. That's what I would have thought is. Yeah. Okay, thank you. Thank you very much. What about the jurisdictional limit the tribal courts have? Is that out? Damages? In the Blackfeet Tribal Court, no. There aren't any jurisdictional limits in order to get into the Blackfeet Tribal Court or in terms of awards that can be granted. There's no limit on awards? No. Thank you. Well, let me ask you another question. Do you have any idea how much it costs to fix each of these houses? Actually, Blackfeet Housing has been attempting to determine that. Some of the houses are in very bad disrepair and would have to be demolished. Some others may be able to be remedied with less than demolished, but would require some work. So the estimate would run, you know, depending upon the severity of the problem. And Blackfeet Housing, when it gets its block grant under NAHASA, has a maintenance program as well for the other houses that are in their housing stock that, you know, there are other problems as well that are attempting to be addressed with ever-diminishing resources. So these people are still living in the houses, right? Yes. And does the tribe have an agency other than the housing agency that would be examining if there are health problems? Not that I'm aware of, no. Is there an ongoing examination of that issue, or has that been resolved? I mean, from your client's point of view, are the people living in those houses subject to health risks? We haven't got there, and I hesitate to say anything if we do end up being a defendant in a lawsuit, you know. Well, don't we have a public health service on the reservation? Yes, we do, Your Honor. Indian Health Service. Indian Health Service. Right. And that's probably another discussion for another day. Well, I mean, you know, look, I'm worried about the health of these people. I mean, you know, you have all these nice little technicalities, but you've got 100, whatever it is, families of poor people that need help, and from what we hear, you know, they're living in pretty dangerous conditions, unhealthy conditions. I think the tribe would be concerned about it. I think the tribe is concerned about it and has made substantial efforts outside of the courtrooms to attempt to deal with them, but has not been successful. It requires extra money. Well, why can't HUD come up with the money? Well, I think that... They gave them the money to begin with. They were watching this thing. Maybe they dropped the ball. I don't know. HUD over there. Secretary, get the money. Leave that answer to Mr. Cownie and HUD counsel. Let me ask the HUD counsel a question. Is there any way that HUD can come up? Why don't you take the microphone over here? You know, I have to tell you this. I've spent a lot of years, and still do, on affordable housing in Los Angeles. In connection with the construction of the I-105 freeway, we've developed, as we speak, over 12,000 safe, sanitary, and affordable housing units. Why can't HUD help on this? It sounds pretty disgraceful, doesn't it? It's extremely frustrating for HUD. By the way, my name is Harold Rennett from Office of General Counsel HUD in Washington. Extremely frustrating for us because the Congress, partly for some of the reasons you mentioned earlier, does not favor HUD and does not trust HUD. Congress now has gotten to the point in which it has provided HUD in the public housing arena, in the Indian housing arena, essentially no discretionary money. Indian housing is an Indian housing block grant. It's a formula grant. It's mechanical. Public housing, non-Indian public housing, exactly the same thing now. Since 1998, public housing authorities get a capital grant, formula grant, and an operating grant, formula grant, and there is no discretion. HUD no longer has the ability to spend money for situations like this. And believe me, as someone who is in the Office of Litigation, that impacts me rather dramatically. We would like to have had the opportunity in the mediation process, in this case, to have settled it. I cannot settle litigation for money anymore because we don't have the ability to expend money outside of this construct that Congress has given us now. Does the formula allow new houses to be built or only if Congress specifies that there shall be 82 units in such and such a place? There is no question that Indian housing authorities and public housing authorities have the authority under the statutes to build housing. The trouble is, as I think Judge Cragerson would affirm, building housing is very expensive. And you don't have the money for that either. Indian housing authorities and public housing authorities to which we give these formula grants find the amount thereof, which is, again, a function of congressional appropriations, insufficient to build new housing. It's all they can do with the money that Congress is giving them through HUD to maintain the housing they have. Or, in some cases, they have to spend money to demolish housing. And that's not cheap either. Sometimes you have asbestos in the public housing that's been built in the past. The housing is now completely not usable. And in order to demolish it, you have enormous costs of containment of that asbestos. So it sounds like what you're saying is this is essentially a political question that has to be addressed to Congress because there's no money. As a practical matter, that's true. Congress in the year 2000, I believe, actually did pass a special bill for, I believe it was the Turtle Mountain tribe in South Dakota. That, I think, is the sort of thing that would be needed here to deal with this problem, absolutely. If the Montana congressional delegation could get a special- There's only one. There's only one. There's one representative, but two senators. Two senators. Two senators and one congressman. If they could get some special legislation passed, I guess that could address it. But assuming that we don't have something like that, it seems like a strange system, although it's just like government problems in other areas. If the government were held liable to pay, let's say, $10 in damages, there'd be a fund out of which that would come, whether it was $10 or $10 million if it was a damage award, right? But if you try to get the money to have a program, you can't get it right now, you're saying. Your Honor, I will tell you that it would depend on what we would have to spend the $10 on. Because, again, we can, under the Anti-Deficiency Act, only spend money for the purposes that Congress has appropriated it. We have several courts who have held us responsible for attorney's fees. We do have a salaries and expenses account in which we can say, yes, this is an expense of the department, and we are paying attorney's fees out of that. But for something like this, it really is much more akin to a substantive judgment, and we don't have an appropriation out of which we could pay $10. If you had a substantive judgment, you wouldn't be able to pay, you're saying? No. I mean, I don't think we can say that when Congress appropriated our salaries and expenses line item, it was thinking about paying for evaluation of environmental problems. I might be wrong, but it could be a judgment against the United States. Let me ask this. If you did a mediation, have you done a mediation in this case, or are you saying it couldn't be conducted? The mediation process was initiated, and we had to come in and say what I just said to the court, which is, there's just nothing to talk about because we don't have any discretionary money. A district court mediation process? No. No, this was at the 9th Circuit. And believe me, as a litigator for HUD, I would love to have the ability to settle litigation for money. I cannot do it these days. The tribe is broke, is that it? I have no knowledge of what the financial circumstances of this tribe are. HUD certainly gives the tribe money every year, Indian Housing Block Grant money. What housing authorities do, I will tell you, in terms of building housing if they need to, or even finding money to demolish housing, is to finance it. What they have to do now is go to banks, seek financing, and what they're pledging to those banks in repayment are future block grant expenditures. I must say that if I were a bank, I would be worried in this day and age about Congress's continuing ability to fund the programs in question. And quite frankly, Your Honors, there are cutbacks in the federal housing programs, and talk about elimination of public housing still within Congress. Very serious discussions. I wish it were otherwise. That's very sad. Well, I appreciate what you've told us and your frankness. Well, we appreciate the concern of this court for this situation. HUD shares that concern. Thank you. Thank you. All right. I think we've heard enough, haven't we? You want to say something? Anything that's going to be helpful? I just wanted to address a few of the points that were brought up. Do me a favor. Come right to the point. The court's concern regarding the actual documentation under the mutual home help program that these houses were originally sold or leased to the tribal members is, of course, an important question. But it must be noted that in addition to those original owners or occupants of the home, there have now been hundreds and hundreds of other members as leases turn over their individuals. They moved into the homes. They have never heard of these programs, nor have they seen any documentation. The district court was concerned with the threshold jurisdictional questions that are presented here. No, there has been no factual discovery. Whether additional discovery would flesh out anything regarding the existence of duties under NASDA or under the earlier acts, yes, the government politely buried the district court in regulations, boxes and boxes and boxes of them. Again, I would bring the court's focus back to the fact that the plaintiff's argument in a nutshell is that currently there is a waiver of sovereign immunity under NASDA that can be declared by this court. Currently, there are duties under NASDA regarding existing housing to go in and remediate and repair, and I would cite specifically 25 United States Code section 4132, wherein there are operating assistance funds available for housing previously developed or operated per HUD or other Indian housing authorities. There are current duties. There are current obligations. HUD is not the enemy, neither is the tribal authority. In fact, if we could join hands and go forth on behalf of these people to obtain the funding from Congress, according to the Native American News broadcast on National Public Radio of April 20, 2005, this year Congress has cut $53.1 million from Indian housing programs. I missed what you said earlier. Well, it's on tape. I'll listen to it. They made a point just a few minutes back. That many of the occupants of the homes, the lessees... They're gone. They're gone. Before that. Before that. We're going reverse now. I'm sorry, Your Honor. We're going fast reverse. Going fast reverse. I thought you said that there were obligations under the... That currently exist? That currently exist. Under present Indian housing programs, yes. Under present Indian housing programs. What? The Native American Housing and Self-Determination Act, which was enacted in 1996, which revealed... You referred to it as NASDA, the N-A-H-S-D-A. S-D-A, NASDA. How can that help here? That can help here because it is currently applicable. There are current duties on behalf of HUD to use operating funds in order to address existing housing problems in order to provide safe and decent housing. But it has no waiver of sovereign immunity, right? Appellants contend that it does, that otherwise the NASDA would have to be construed to be retroactive prohibited legislation because it would destroy the causes of action that previously existed. The situation of continuing towards all of these factual issues upon a remand to the district court could be explored. The claim has come before this court with the full arm of its arguments, attempting to emphasize which are our strong points and showing you our weaknesses as well. We seek a reversal of the district court on the Legal Errors Administrative Procedure Act, on the failure to find a waiver under NASDA and current duties under the Indian Trust Responsibility. But you want additional discovery? You want discovery? We would like to reverse a remand to go back to the district court and commence the litigation of this case. You want discovery? Factual discovery, yes. On what? To support the additional claims that we have for Indian Trust Responsibility. You want us to say that there's not sovereign immunity so that you can proceed on the merits of your claim? Yes, Your Honor. Thank you for saying it better. Oh, I see. Okay. Oh, I understand. Or you had a motion to dismiss here where the court went outside the record, which converts it to a summary judgment motion. The motions to dismiss... And you had no opportunity to conduct discovery. No, sir. The court converted the threshold motions to dismiss into ones for summary judgment to the extent it went beyond the record, exploring what the duties... That's what I said. ...then and now. But we have not had opportunity for any discovery into the factual merits of the plaintiff's allegations. The seriousness of the... Well, we've got to get over the sovereign immunity thing first. Yes, sir. It's the threshold issue that's brought us before you today. It's the point that was of interest to me with the Housing Authority's counsel on what's in the initial leases that were entered. It seems to me it may bear on the sovereign immunity, or at least it has to be looked at. I'm surprised they're not in the record. It's not as to whether they illuminate any duty owed on the merit, but as to whether they make any references to the sue-and-be-sued clause or to regulations or, you know, to anything that bears on the analysis of the sovereign immunity issues vis-à-vis the Blackfeet agency. I don't know whether it affects the federal government or not. Those types of materials were sought in two discovery requests propounded by the plaintiffs in the district court. They were rebuffed, and those were ultimately dismissed when the court found that there was no waivers of sovereign immunity. Well, counsel today said that he would be willing to produce a copy of the standard form agreement for the court. Are you willing for that to be produced as well? Oh, of course. Okay. Of course. We don't need any more argument about that. No. Well, as usual, wonderful arguments from my lawyers. And Washington. And Washington. And a special visit. Thank you. Thank you. Thank you. All right. You're through? Yes, sir. Are there any more questions? Thank you. Here's what we'd like you to do. You know, the sovereign immunity issue is not an easy one, and we've heard a lot of talk about it. And I'd like you to submit to us, say, a post-argument brief, but not to exceed ten pages. Step-by-step, you know, what your arguments are on whether there is or whether there's been a waiver of – well, we know there is – but whether there's been a waiver of or has not been a waiver of sovereign immunity. Do you want to give a date on that? Yeah. You all understand what I'm saying? No, sir. I don't understand. What? Are you referring to the sovereign key or am I trying to stop you? Both. Both. Both. Both. You see, people can come up here. There's a vast amount of material here. And, you know, you've lived with that, and, you know, you're moving around this area and another area, and you're weaving all these things in, huh? You know. I want a one, two, three, four. Huh? You've got a short space. Put it down so it's very, very clear where you're going. In other words, a path. Or if you were going to write an opinion that there's been a waiver of sovereign immunity or there has not been a waiver of sovereign immunity, this is the way you would do it. Because right now we've just got to – When do you want that? Oh, when do you want it? I don't know. I don't know. I don't know. How about 15 days? Yes, Captain. I see one of the letters. I'm needing more time. You'll be on the river. You may be up the river. At the very last, it's been 30 days. Sure. Why don't we say four weeks? I would say four weeks. Four weeks. Four weeks is plenty of time, you know. The living is easy. All right. And that will give Council, I think, an opportunity to give us a document that's ready to go. Yeah, right. And the briefing we got initially was excellent on both sides, you know, from all parties. But this would also let each of you address any issue you want to emphasize in light of our questions. Okay. Well, what's the date then, 30 days from now? Okay. Four weeks from today will be another Thursday. We can get an order if you want to do a formal. Can we just do it on the record? No, just do it on the record.  Four weeks from today. Four weeks from today. July 14th. July 14th. You know. Bastille Day. Just want to, yeah, Bastille Day. My Judge Trott has always said, when his dad was one of the executives at Procter & Gamble, he had a rule. If you can't put it down on one page, don't give it to us. We're giving you 15 pages. No, I mean, what did I say? Ten. Ten. Ten. Well, he was nodding his head, you know. But ten pages. You got ten pages, and, you know, this is like a good, tight executive summary where you're just going to lay it out. You got that? Not going, you know, if you walked into the boss and you gave him these long, long stories, he'd be asleep. So, you know. We have the argument, too. Yeah, we may have some more. Clear, concise, declarative sentences. Okay? Go in peace. We'll recess until tomorrow morning at 930. This court for this session stands adjourned.
judges: Pregerson, Graber, Gould